Ethel F. HAMILTON, Appellant,

v.

LACLEDE ELECTRIC COOPERATIVE, a Corporation, Respondent.

No. 45226.

Supreme Court of Missouri.

Division No. 2.

Sept. 10, 1956.

Rehearing Denied Oct. 8, 1956.

Edgar Mayfield, Lebanon, for appellant.

Allen, Woolsey & Fisher, Clarence O. Woolsey, Russell G. Clark, Springfield, for respondent.

BOHLING, Commissioner.

Ethel F. Hamilton, plaintiff, sued the Laclede Electric Cooperative, a corporation, defendant, for $10,000 damages for injuries received as the alleged result of negligence in the construction and maintenance of a high voltage uninsulated electric wire in use to supply electric power to plaintiff's farm home. The court sustained defendant's motion for a directed verdict at the close of plaintiff's case on the ground plaintiff's evidence established her contributory negligence as a matter of law.

Plaintiff and her husband were engaged in removing a pipe and pump from a drilled well when the pump came in contact with one of defendant's wires and plaintiff was severely shocked and burned. Her petition charged defendant was negligent in locating a high tension uninsulated wire directly over the well; in failing to insulate said wire and keep the same insulated; and in failing to warn plaintiff of the danger. She contends in her brief defendant should have "located said line in a different place, at a greater distance as well as height from the well" or should have "insulated said line"; and that plaintiff was not contributorily negligent as a matter of law.

Mr. and Mrs. Hamilton, as husband and wife, had purchased a 120 acre farm in Dallas county, Missouri, and took possession on March 10, 1954. They knew the farm had electric service. Plaintiff stated she would not want it without electric service. The Hamilton house is east of a north-south gravel road, facing it. They had a big yard south of the house, with the drive on the south side of the yard. A "drilled well," with a "pitcher pump," was in a well house 12 to 15 feet south of the east side of the house. The well house was about 3½ feet wide, 10 or 12 feet long and 7 or 9 feet high, with the well in the southwest corner. The door was on the north side of the well house, and about over the well was a hole in the roof, about 6 or 8 inches wide and extending 12 to 18 inches down the roof.

Defendant's high tension line was on the west side of the road. The transformer pole for service to the Hamilton farm was

south and east of the well house and 65 steps of approximately a yard each from defendant's main line. Three insulated wires ran northeast from the transformer pole to other poles. The meter measuring the service and a yard light were on a pole or on different poles in the yard. The two wires from the road to the transformer pole are here involved, particularly the top wire. They were uninsulated and carried 7,200 volts. Mr. Hamilton testified these wires were "four big steps" south of the well. This was the testimony of Otis Richardson, plaintiff's other witness on the issue, who testified that the pump and pipe had to lean in a southerly direction about 12 feet before it would hook onto the wire involved.

The water from the well became muddy, unfit for drinking, cooking or washing. Mr. Hamilton had pulled pumps before, and plaintiff had helped pull pumps at least a couple of times. She testified that she and her husband owned the farm and the pump and pipe together and that they were pulling the pipe for their joint benefit, as did Mr. Hamilton. Neither knew the depth of the well nor the length of the pipe in the well. They decided to pull the pump about 3 p. m., March 25, 1954. Mr. Hamilton went to the well house, took some "rotten" boards out of the floor and handles and things off of the pump. The dirt floor was damp. He called for plaintiff to help. Mr. Hamilton would lift the pump and pipe about 3 feet, plaintiff would hold it while he secured another grip, and this procedure would be repeated. No wires were over the well house. Plaintiff testified: "If you had kept them over there [the hole in the well house roof], we would have seen them"; but neither she nor her husband looked up through this hole.

Mr. and Mrs. Hamilton were facing north, toward the door, and just as the pipe cleared the well casing there was an "explosion" and Mr. and Mrs. Hamilton were "knocked" out of the door and severely injured. Plaintiff and her husband were taken to a hospital in Lebanon, where they remained overnight. They returned home the following day. Plaintiff re-entered the hospital on April 15th and remained there until May 10, 1954.

The pipe and pump assembly had contacted the top wire to the transformer pole, and the pump spout had caught on it. Mr. Hamilton testified the pipe was in joints, "two or three"; but they did not unjoint it, because they had no wrenches to take it apart. He thought the joints were short, probably 12 feet. The pipe and pump were measured later and were 31 feet and 2 inches in length, the pump being 12 to 18 inches long. The whole weighed about 100 pounds. When plaintiff was injured, 24 or 25 feet of pipe was above the hole in the roof, which was between 7 and 8 feet above the ground.

On March 25, 1954, plaintiff was 49 and Mr. Hamilton was 43 years old. He had worked for a utility company in "high lines," had known from the time he was 17 or 18 that electricity was dangerous, and had quit such employment because of his fear of electricity. Plaintiff worked for "Sears Roebuck in Kansas City" from 1925 to 1946. She then worked for four years as a driver of a taxicab in Kansas City. She and Mr. Hamilton were married in 1946. After her marriage she drove a taxicab in Oklahoma. Her husband was in the United States Army and was ordered overseas. She went to New York and worked in the "Sears telegraph office" for five months. She then joined her husband overseas. They purchased the farm soon after his discharge from the Army.

The Hamiltons had no telephone, only electric service. They knew electric service was furnished by means of wires strung on poles. When they purchased the farm, plaintiff secured the meter reading from defendant and checked the meter to see if the reading was correct. The lights and electric appliances in the house were operating properly. All of plaintiff's witnesses testified there was nothing obstructing the view of the wires and poles serving plaintiff's premises. Plaintiff testified with ref-

erence to the wires: "Q. If you had looked up there, you could have seen them? A. Yes, they were in plain sight." However, the testimony of plaintiff and her husband is to the effect that while they knew wires furnishing electric service were dangerous, each "paid no attention" to the wires until after they were injured. Mr. Hamilton stated he had probably seen the wires, but when he got ready to pull the pump, that didn't enter his mind, "didn't think about it at all"; that "Q. If you had seen the wire there you would have known it was dangerous? A. If I had seen the wire I would have known it was an electric wire and dangerous. Q. You didn't look to see? A. No." If he had unjointed the pipe, it would not have come in contact with the wire. Asked if he took any precaution at all to keep the pipe from coming in contact with the electric wires, he answered: "I said I didn't even know those electric wires were up there." After the occurrence, Mr. Hamilton looked at the wire in qeustion and could easily tell it was not insulated; but plaintiff could not tell whether the wires were insulated. Plaintiff's witness Otis Richardson, a neighbor, testified he had no trouble knowing which wires were insulated and which were not while standing on the ground; and that the distance from defendant's line to his yard pole, the location of which was not shown, was 60 steps and the wire was insulated.

Plaintiff, asked if she would have intentionally pulled the pump and pipe into the wires, answered: "Absolutely not. Q. Why? A. Who wants to get hurt? Q. You knew it would be dangerous to do that? A. Why, sure." She also testified: "But I didn't realize there was a wire within a mile of that pump house because I hadn't paid any attention to it." And: "If I had an idea he [her husband] was going to put a pump into a live wire, I would have stopped him and so would anybody"; she would have warned him.

Plaintiff cites cases on the duty of an electric utility to exercise the highest degree of care to prevent injury to persons who lawfully might come in close proximity to its wires, Gladden v. Missouri Pub. Serv. Co., Mo., 277 S.W.2d 510, 515; Lebow v. Missouri Pub. Serv. Co., Mo., 270 S.W.2d 713, 715 [2], and that the duty includes the insulation of the wires at places where workmen are likely to be injured from contact with them. Geismann v. Missouri-Edison El. Co., 173 Mo. 654, 678, 73 S.W. 654, 661; Ratliff v. Mexico Power Co., Mo.App., 203 S.W. 232, 234 [1–3]; Williams v. City of Fulton, 177 Mo.App. 177, 164 S.W. 247.

It is stated in Atchison, T. & S. F. R. Co. v. Calhoun, 213 U.S. 1, 9, 29 S.Ct. 321, 323, 53 L.Ed. 671: "But, even where the highest degree of care is demanded, still the one from whom it is due is bound to guard only against those occurrences which can reasonably be anticipated by the utmost foresight. It has been well said that, 'if men went about to guard themselves against every risk to themselves or others which might, by ingenious conjecture, be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' Pollock, Torts, 8th ed. 41."

■ There is no direct testimony on the height of the wire in question. From the length of the base and approximate length of the hypotenuse of the right angled triangle involved (the distance from the well to the defendant's line and the total length of the pipe or its length above the roof of the well house) some reasonable estimate of the height may be calculated. This would bear on defendant's actionable negligence. We recognize contributory negligence postulates negligence; but the evidence on behalf of plaintiff appears to so clearly establish her negligence as a matter of law directly contributing to her injuries that we rule this review on the ground

stated by the trial court and earnestly controverted by plaintiff. In so proceeding we do not rule the issue of actionable negligence.

■ An electric utility is not an insurer of the safety of persons. Its liability rests upon the rules of negligence. State ex rel. Kansas City L. & P. Co. v. Trimble, 315 Mo. 32, 285 S.W. 455, 458, 49 A.L.R. 1047; Howard v. St. Joseph Transmission Co., 316 Mo. 317, 289 S.W. 597, 601 [3, 4], 49 A.L.R. 1034; Brubaker v. Kansas City El. L. Co., 130 Mo.App. 439, 449, 110 S.W. 12, 15. Contributory negligence of a plaintiff defeats a recovery; and where the evidence on behalf of plaintiff establishes plaintiff's contributory negligence, it is the duty of the court to instruct the jury plaintiff cannot recover. Cases supra, and see Scott v. Kurn, 343 Mo. 1210, 126 S.W.2d 185, 187.

Plaintiff cites many cases on contributory negligence.

Davis v. Missouri El. P. Co., Mo.App., 88 S.W.2d 217, 218, 221, and Laudwig v. Central Mo. P. & L. Co., 324 Mo. 676, 24 S.W.2d 625, 628(e), involved injuries sustained while moving buildings along public highways. In the Davis case deceased, on the top of the building, had raised wires with a stick to let the building pass underneath, and, at the scene, as the building moved he placed one hand on the comb of the roof and raised his right foot over the service wire when there was a flash killing him. High tension wires carrying 22,000 volts were between 3 or 4 feet above the service wires. One of the men had warned deceased he was in a dangerous place. The court considered this oral evidence of deceased's knowledge of the danger a question for the jury. The evidence did not establish that deceased knew about the high tension wires or that deceased came in actual contact with any wires. The certiorari proceeding in the Davis case, Mis-

souri E. P. Co., State ex rel., v. Allen, 340 Mo. 44, 100 S.W.2d 868, did not review the court of appeals' ruling on the issue of contributory negligence. In the Laudwig case three judges concurred, three concurred in the result only, and one dissented.[1] Laudwig was injured when, according to the testimony, the electric current jumped 5 to 10 feet. Defendant contended plaintiff knew the wires were high voltage wires and was contributorily negligent in coming so close to them. Plaintiff had evidence that defendant knew electric current would jump and he testified that he was unaware of that fact.

In Thompson v. City of Lamar, 322 Mo. 514, 17 S.W.2d 960, 968 [4], plaintiff was repairing the roof of a building in a city and defendant's wires, loose and sagging and suspended from a leaning pole, extended over the roof 18 to 30 inches and 2 or 3 feet above it. He was avoiding the wires while working, but just as he turned and faced away a sudden heavy gust of wind blew the sagging wires against his body.

In Privette v. City of West Plains, Mo. App., 93 S.W.2d 251, 253, 254 [3, 4], the evidence did not show how deceased came in contact with the electric wire and the presumption was he exercised due care.

In Lebow v. Missouri Pub. Serv. Co., Mo., 270 S.W.2d 713, 716 [4], 718, one of the judges dissenting, an apple picker was working in an orchard in which was a 6,900 volt electric wire, slightly higher than the 18-foot apple tree involved, extending to a transformer for usual farm service. His aluminum ladder had become entangled in the branches, and the picker, who had been warned of the electric wire, jerked on the ladder 3 or 4 times and it came loose and unexpectedly flew over his head and into the wires, killing him.

In Gladden v. Missouri Pub. Serv. Co., Mo., 277 S.W.2d 510, 515, an adult climbed a tree in full leaf in an attempt to catch a

1. Consult Coleman v. Haworth, 320 Mo. 852, 8 S.W.2d 931, 934 [10]; Viquesney v. Kansas City, 305 Mo. 488, 266 S.W. 700, 702 [6]; State ex rel. Columbia National Bank of Kansas City v. Davis, 314 Mo. 373, 284 S.W. 464, 467 [1].

tame parakeet, and was injured when his thumb accidentally came in contact with one of defendant's bare wires carrying electric energy along a much traveled public highway through a populous unincorporated area. The tree had not been trimmed for 2½ years. Plaintiff did not know that the wires in the tree were electric wires. The court observed: "As to contributory negligence of plaintiff, if he knew these wires were electric wires we would have to hold that he was guilty of contributory negligence as a matter of law in getting so close to them."

The above cases are representative of plaintiff's citations. They involved instances where the injured person came in bodily contact with electric wires in populous areas and at public places or at places and under circumstances where defendant knew, or in the exercise of proper care should have known, that persons rightfully transacting business thereat were likely to come in bodily contact with the wires. In some the current jumped or arced and caused the injury. They differ from the factual situation in the instant case, where there is no indication of record that defendant's wires were, or were likely to be, touched by the body of a person on the farm. Thompson v. City of Lamar, supra, 17 S.W.2d loc. cit. 972, quoting with approval Ratliff v. Mexico Power Co., supra.

We find no Missouri cases directly in point. The following cases from other jurisdictions involved somewhat similar facts.

Dresser v. Southern Calif. Ed. Co., 28 Cal.App.2d 510, 82 P.2d 965, 968. A high tension wire was 5 feet south of a well and 19 to 23 feet above the ground. Plaintiff was removing a rod from the well, and, after unjointing a 22-foot section, it came in contact with the wire The court considered one should make reasonable use of his faculties to avoid injury from acts others are lawfully entitled to perform; and said: "Plaintiff was in no danger at

all until he raised the rod to the height of the wires. He knew the wires were somewhere above him. He did not ascertain their exact location. He did not know if the wires were insulated. He could have determined this fact by simply looking at them. He did not look at what was in plain sight."

In May v. Illinois P. Co., 342 Ill.App. 370, 96 N.E.2d 631, 633, men were lifting a pump and pipe, 35 to 40 feet long, from a well on a farm. The wires were 7 feet 2 inches south of the pump and 20 to 25 feet high. The court said: "The fact that the pipe swung in the direction of the wires and exposed the men to electric shock must necessarily have resulted from contributory negligence on part of plaintiff's intestate."

In Hale v. Montana-Dakota Util. Co., 8 Cir., 192 F.2d 274, 278, a surveyor's rodman was using a 15-foot rod that was collapsible to lengths of 5 or 6 feet in a prairie field on a rise in the surface of the ground when he brought the rod in contact with a high voltage electric wire to his injury. We quote: "Knowing the presence of these lines and the danger arising from contact with them, ordinary care required either that he shorten the rod to five or six feet or place it to one side of the lines."

Consult also Gladden v. Missouri Pub. Serv. Co., supra; Morris v. Kansas City L. & P. Co., 302 Mo. 475, 258 S.W. 431, 432; Frauenthal v. Laclede Gaslight Co., 67 Mo. App. 1, 6; Gray v. Union El. L. & P. Co., Mo.App., 282 S.W. 490, 493.

■ "One may not disregard the laws of prudence and exact of others a primary obligation to protect him against his lack of caution. If he exercises due care for his own safety, then, absent information to the contrary, he may rely upon the presumption that others will obey the law." Dempsey v. Horton, 337 Mo. 379, 84 S.W.2d 621, 626 [13–15]; Floyd v. Thompson, 356 Mo. 250, 201 S.W.2d 390, 393 [11]; Morris v. Kansas City L. & P. Co., supra, 258 S.W. loc. cit. 432 [4]:

We said, citing authority, in Branscum v. Glaser, Mo., 234 S.W.2d 626, 627: " 'Where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed.' * * * 'The law is further well settled that "a failure on the part of a plaintiff, where a duty to look exists, to see what is plainly visible when he looks, constiutes contributory negligence as a matter of law." ' " See also Kobusch v. Ruberoid Co., 355 Mo. 48, 194 S.W.2d 911, 914; Empire Dist. El. Co. v. Rupert, 8 Cir., 199 F.2d 941, 946 [6, 7]. Bryan v. Sweeney, 363 Mo. 1024, 256 S.W. 2d 769, 773 [5], involving an injury from an electric shock under the Illinois law, states: "a person in the exercise of ordinary care is charged with the duty of looking and seeing that which is obviously visible, and the law does not countenance the anomaly of a person professing to look and not seeing that which is clearly visible".

■■ Court en banc has observed that a bright, intelligent boy, doing well in school, past 14 years of age and living in the city, should understand and appreciate it would be dangerous to come in contact with an electric wire. State ex rel. Kansas City L. & P. Co. v. Trimble, 315 Mo. 32, 285 S.W. 455, 457, 458, 49 A.L.R. 1047. See Frauenthal v. Laclede Gaslight Co., supra. Persons of ordinary intelligence are presumed to know the dangers attending contact with wires · electrically charged. 29 C.J.S., Electricity, § 66 c, p. 629. Many cases mention that the legal standard for judging the actions of adults is that of· ordinarily prudent person.

·■ In the instant case plaintiff and her husband had no telephone. Their electric appliances had been functioning properly. They had seen the poles in the yard, had to walk under the wires, and knew that elec-tricity was brought to the house by means of wires and poles. No wires were over the well house. The wire involved was 12 feet south of the well. The record indicates no injury would have·resulted had the pipe slanted in some other direction. There were no obstructions to their view of the poles and wires, which plaintiff stated were in "plain sight." Plaintiff and her husband knew that wires carrying electricity were dangerous. They say they did not see the wires; that they did not look. They in effect paid no attention to the wires. The evidence on behalf of plaintiff is that they took no precaution whatsoever. Nothing had occurred to distract plaintiff's mind from the situation at hand, and in the circumstances of record, lack of attention or even forgetfulness does not excuse. Clark v. Missouri Nat. Gas Co., Mo., 251 S.W.2d 27, 31 [3]; Sloan v. American Press, 327 Mo. 470,. 37 S.W.2d 884, 888 [2, 3]; Bryan v. Sweeney, supra [6]; 38 Am.Jur. 863, § 187. "When the negligent act of the plaintiff. is necessary to make a dangerous situation negligently created by the defendant effective in harm, the plaintiff's negligence is always a contributory factor in producing his harm and as such prevents him from recovery against the negligent defendant." 2 Restatement, Torts, 1251, 1252, § 478.

Other issues are advanced in defendant's brief. They need not be developed.

The judgment is affirmed.

BARRETT and STOCKARD, CC., not sitting.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.